## CLINE *v.* GUTHRIE.

PROMISSORY NOTE.—*Fraud in Obtaining Signature.—Want of Delivery.—Innocent Holder.—Estoppel.*—Where the maker of a promissory note payable at a bank in this State was induced by the fraud and circumvention of the payee to sign his name to such note, when he honestly supposed and believed that he was writing his name on a blank piece of paper, to enable the payee to see how his name was spelled or written, and the maker did not, after he discovered that he had so signed his name to the note, voluntarily deliver it to the payee, but it was taken possession of wrongfully and forcibly by the payee, and by him carried away against the consent of the maker and negotiated;

*Held,* that the maker was no more bound by his signature than if it were a total forgery, although the person to whom it was negotiated was a purchaser and holder in good faith and for a valuable consideration before maturity.

*Held,* also, that admitting that the maker signed his name to the note, with full knowledge of its character, it was nevertheless invalid and void, even in the hands of an innocent purchaser for value, for the want of delivery; nor ⌐ ⌐ the maker liable on the ground that when one of two innocent persons mᵤ ᶳᵤf-fer by the act of a third, he who has enabled such third person to occasion the loss must sustain it.

APPEAL from the Scott Circuit Court.

BUSKIRK, J.—This action was brought by the appellee upon a promissory note of the following tenor, the italicised words being the written part of the note:

"*Lexington, Scott Co., Ind., Oct. 22d,* 1869.

"*Nine months* after date *I* promise to pay Miles & Spaulding, or bearer, *two hundred and eighty-seven &* 50-100 *dollars,*

payable at the First National Bank of Madison, for value received, with interest, without relief from valuation or appraisement laws, interest at 10 per cent. per annum after maturity, and attorney's fees if suit be instituted. The drawer waives presentment for payment, protest, and notice of protest and non-payment of this note.

"$287.50.                              *Abraham Cline.*"

Endorsed as follows:    "Sold and transferred this day to A. Guthrie, without recourse to us, Nov. 20th, 1869.

                              " MILES & SPAULDING.

                                    " Per MILES."

The complaint avers that the appellee was the owner and bearer of the note before maturity, and was still the owner, and that it remains unpaid, with interest and attorney's fees; and that reasonable attorney's fees for collection was reasonably worth fifty dollars; and demands judgment for the amount of the note and interest, and for fifty dollars attorney's fees.

There was no demurrer to the complaint, nor motion. The defendant below answered in four paragraphs, as follows:

1. The general denial, not under oath. 2. A special answer, but afterward withdrawn, and is not in the record. 3. A special plea, sworn to. 4. A plea of entire want of consideration, and that the appellee was not an innocent purchaser and *bona fide* holder of the paper.

The appellee filed demurrers to the third and fourth paragraphs of the answer, which were overruled, and the appellee excepted.

The appellee then filed a reply putting the case at issue.

The cause was, by agreement, submitted to a jury of five; and they were requested by the court, on suggestion of appellee's counsel, to answer certain interrogations, in addition to finding a general verdict.

The jury found in their general verdict that there was due the appellee $363.07; and the special findings were as follows:

1. Did the plaintiff receive the note in the usual course

of business, without notice of any fraud, or forgery, or want of consideration, or other defence?

Ans. Yes.

2. Did the plaintiff pay a valuable consideration for the note?

Ans. Yes.

3. Is the signature on the note the signature of the defendant, Cline?

Ans. We believe it is.

4. Are there any alterations apparent on the face of the note?

Ans. No.

5. If the signature is the defendant's, has the note been altered since defendant's name was put there?

Ans. We believe not.

The motion for a new trial was for the following reasons, to wit:

1. The verdict of the jury was contrary to law.

2. That it was not sustained by the evidence.

3. The assessment of damages was too large.

4. Error in a certain instruction of the court, and in admitting certain evidence; which instruction and evidence are properly set out in the motion.

5. The special findings were contrary to law, and not supported by the evidence.

The appellant has assigned for error the overruling of the motion for a new trial.

The appellee has assigned as a cross error the overruling of the demurrer to the third paragraph of the answer.

The questions presented by the overruling of the demurrer to the third paragraph of the answer, and the overruling of the motion for a new trial, because the verdict was contrary to, and not supported by, the evidence, are identical; and we will consider them together, and to make our decision intelligible, we will set out the third paragraph of the answer and the substance of the testimony.

The third paragraph of the answer reads as follows:

Third Par. For further answer to said complaint, said defendant says that his signature to the "note" in plaintiff's complaint mentioned, and a copy of which is filed therewith, was obtained and procured by the payees thereof, the said Miles and Spaulding, in the following felonious and fraudulent manner: On or about the date of said note, October 22d, 1869, two persons came to his house in Scott county, Indiana, representing themselves as agents for the sale of a patent, which they called "The Screw Hay-Fork," and solicited him to become their agent for the sale thereof in said county. And defendant says he did consent to take such agency; and thereupon one of them sat down at defendant's table, and proceeded to fill up a printed blank, which they called a letter of agency, whereby they professed to constitute defendant sole agent for the sale of said patent in said county, for which defendant was not to pay any thing, but was to account at an agreed rate for the proceeds of sales after said forks should be sold; and while writing such letter of agency, the writer requested the defendant to write his name on a blank piece of paper, which said writer held in his hand on the table, to enable him, as he said, to see how defendant's name was spelled or written. And defendant says that, without any knowledge or intention on his part of signing any instrument in writing whatever, and believing that he was only signing his name for said purpose, he reached over on said table and signed his name on such blank piece of paper, for the purpose aforesaid, and for no other purpose whatever; that shortly afterward, the defendant discovering that he had signed the note sued on, instead of making his signature for the purpose and with the intention aforesaid, he objected, and demanded of said parties to deliver up to him said note, which they refused to do, and he was unable to compel them to do so; and they immediately left defandant's premises, taking with them the note procured in the false, fraudulent, and felonious manner aforesaid. And said defendant says that he immediately followed them, for the purpose of compelling them to give up said

note, and thereby preventing them from putting the same in circulation or selling it; but they escaped, and he was unable to find them. And he shortly after took counsel of an attorney as to the proper steps he should take in order to save himself from paying said note, and was advised that said note could not be collected; since which time the whereabouts and residence of said Miles and Spaulding are wholly unknown to him, although he immediately after made inquiry, for the purpose of compelling them to surrender up said note; wherefore the defendant says that the note sued on, and in plaintiff's complaint mentioned, is not his act and deed.

This paragraph was duly sworn to.

The substance of the evidence is as follows: ·

The note and endorsement were put in evidence, under an agreement that the question of the due execution of the note should be submitted to, and determined by, the jury, with the other questions in issue.

Samuel S. Crowe testified: He was an attorney at law of the Scott Circuit Court, and that reasonable attorney's fees in the case on trial would be ten per cent. on the whole amount of principal and interest.

Archie Guthrie, plaintiff, testified: He had lived at Madison, Ind., five years; that he got the note of Miles & Spaulding at the date of the assignment; bought it, with two thousand dollars worth of other like notes, of M. & S., all upon men in Jefferson county, except one in Clark; that he could not state exactly the consideration paid for the note in suit; it was a lumping trade, he paid over two thousand dollars in money; that he thought he took about ten per cent. off the face of the notes purchased; he asked Alexander Monroe about the solvency of Cline, before he bought the note; that he knew of no defence to the note at the time he bought it; that no part of it had been paid nor the attorney fees; that Miles & Spaulding were strangers to him, and he did not now know where they lived.

Abraham Cline, being introduced as a witness, testified as

follows: "A portion of the signature to that note looks like my handwriting, and a portion does not.  The word 'Abraham' looks like my writing, and the word 'Cline' does not. I can't say whether it is my signature or not.  I saw that note at the last term of the Scott Common Pleas Court, when it was in suit in that court.  I saw it again yesterday, in the grand jury room, and perhaps at Harlan's Hotel, in this town.  At Harlan's I told you [Attorney Friedley] it did not resemble mine.  I did not sign any note.  All I know about that note is this: One morning—the day of the date of the note, I think—as I was going out to my field to work, two men came to my house in a buggy.  They met me near my stable, and proposed to sell me a patent hay-fork.  I told them I did not want it."  [Here the defendant details at considerable length their conversation, in which he told them he had no money to buy it, and they replied that they did not want any money, which they repeated several times, and proposed to make defendant an agent for the sale of said forks, in Scott county.]  "I was not to pay any thing unless I made sales.  *  *  I finally told them I would take the agency upon those terms.  We went to the house for them to do the writing.  *  *  When we got to the house, I set out a stand table, and Miles sat down on one side, and I was sitting on the other side, two feet or nearly from the table, with my left side to the table.  I had on my lap one of my children, which was crying, and I was busy trying to keep it still.  As soon as Miles sat down, he took out several papers, and said he would fill a blank letter of agency to authorize me to sell the fork; and before he began to write, he shoved over to me what seemed to me to be, and I think was, a blank piece of paper, he holding to one side of it, and requested me to write my name on it, so that (as he said) he could see how my name was spelled.  With my child in my arms I leaned over, and partly turned around, and wrote my name on the blank piece of paper which he held in his hand.  I saw nothing but a blank piece of paper.  I paid no further particular attention, except I noticed he went to

writing something. After writing a while, their horses in the buggy, which was hitched at the gate, got scared; and thereupon they both jumped up and ran out to their horses. While they were out, I picked up a paper from the table and saw that it was a note that I had signed for two hundred and eighty-seven dollars, instead of the blank piece of paper. I first concluded to stick it in the fire, but on reflection I concluded to wait till they came back, and I laid it down on the table again. In a few minutes, they came in, and I spoke to them and asked them what that meant—that I had not signed any note, and would not stand it, and would not let them have the note. And immediately, before I had time to take it up again, Miles picked it up right from under my nose and put it in a large pocket-book, and put it in his pocket. I then did not know what to do, and we got into a quarrel about it. Miles finally said he would make it all right, and picked up a piece of paper (it was the letter of agency then lying folded up on the table, but I then did not know what it was, not having seen its contents), and wrote something on the back of it; and immediately both of them left, got into their buggy and drove away towards Lexington." The witness then relates about following them and failing to find them, and concludes his testimony in chief by stating: "I wrote my name on one piece of paper only."

On cross-examination, the defendant stated the following additional facts: "I never did receive any thing for said note; there was no consideration for it. The paper I signed looked a third larger than that note. I did not agree to pay them any thing, except after I sold the forks. I never agreed to sign any note. If I did sign that note, I did not know it was a note. I thought it was only a blank piece of paper. When I signed it, I saw nothing but the blank paper. When I picked it up from the table, while they were out at their horses, I did not read it all. I do not think those printed lines at the bottom were there. I did not notice them. I think, but cannot say positively, that I then

saw some printing on the paper; I mean, I saw the printing after the men went out to their horses, but not before.    *  *    *  .  I cannot tell exactly what was in it.   I only say I did not then see or notice this printed part of this note, if it is the same note.   I never gave these men any note.   This is the only transaction we ever had.    I did tell Daniel Hennessey, a short time after the transaction, I would like to sell him a hay-fork if they sent them on; and he told me to be careful."

The letter of agency referred to by Mr. Cline was read in evidence, over objection and exception of appellant, and is as follows:

"Whereas Miles & Spaulding are the proprietors of the Screw Hay-Fork, in the State of Indiana:

"Now this indenture witnesseth that an order for twenty-five forks has this day been made by Abraham Cline, at twenty dollars each, and we have made and appointed him our legal agent to sell said fork in all the townships of Scott county, Indiana, and no where else.   This agency is to continue in full force for the term of twelve years.   The said Miles & Spaulding obligating themselves not to appoint any other agent for said territory.

"The said Miles & Spaulding further agree that they will furnish and fill all orders hereafter drawn by their agent, with reasonable dispatch, and at the express office named in the order, at the price of six dollars, free of freight, to be paid for on delivery.   All orders for forks to be drawn on Bass & Hanna, Fort Wayne, Indiana.   Orders for pulleys to be drawn on Garrett & Co., Shelby, Ohio.

"Dated Oct. 22d, 1869.          Miles & Spaulding."

And there was endorsed on the back of said writing:

"Received on the within order two hundred and eighty-seven 50-100 dollars in this note; it is expressly understood that the said Abraham Cline is not to pay for any more forks than he orders."

Jessamin G. W. Traylor testified: He had been clerk of

the circuit court of Scott county, and was acquainted with handwritings; that comparing the signature on the note with an admitted genuine signature of defendant, he thought it was the signature of Cline.

Daniel Hennessey, expert, said: " Comparing the signature of the note with the signature now shown me, I think the signature on the note genuine. The defendant, shortly after the transaction, wanted to sell me a hay-fork; he said he expected to make the money out of them before he would have to pay for them; he said nothing to me about the note."

John S. Swope, expert, testified: "By comparison of this note with this genuine signature, I think they are the same. I see some difference, but not more than is common in genuine signatures. By examining the signature and the body of the note with an eye-glass, I can see some difference in the color of the ink, a shade. I have noticed the same difference in writing out of the same ink-stand."

Reese Morgan, expert, testified: "By comparing this signature with the genuine one now shown me, I think they are the same. I notice some difference, but not more than men usually make in signing their names. Cline told me they had got his name to a paper, and while they had gone out he saw he had signed a note, and they would not give it back to him."

William E. Hammel testified: Cline told him he did not know he had signed a note until the men went out to look at their horses; that at first their putting the writing on the certificate satisfied him, but he got dissatisfied afterward and wanted the note back, but they would not give it up.

Almond D. Hinds testified: Cline told him they had gotten his note for two hundred and eighty-seven dollars, and had gone off and sold it to a bank; that he (Cline) thought he was signing some paper connected with the agency, but that it was a note. He also said there was a contract of agency, and there was where they got the advantage of him.

Archie Guthrie testified: Cline told him at Harlan's Hotel he did not deny his signature, but the note was different from what he saw. He also swore, on a former trial, if the note was as it now is, he did not so read it.

Abraham Cline, defendant, testified: "I don't think I told Hinds I was signing part of the contract of agency; I don't say that I remember all that was said.

"Guthrie is mistaken about what I said at Harlan's Hotel. I said the signature looked like my signature."

Alexander Monroe: "Guthrie inquired the same day he bought the note if Cline was responsible, and would do to buy a note on."

The substantial facts averred in the third paragraph of the answer, and those proved on the trial are, that the appellant was induced, by the fraud and circumvention of the payees of the note in suit, to sign his name to such note, when he honestly supposed and believed that he was writing his name on a blank piece of paper, to enable the payees to see how his name was spelled or written, and that the appellant did not, after he discovered that he had signed his name to the note, voluntarily deliver the note to the payees, but that the same was wrongfully and forcibly taken possession of by the payees, and by them carried away against the consent, and over the objection, of the appellant.

Do the above facts constitute a valid defence to the note, in the hands of a purchaser and holder in good faith and for value, before the maturity of the note?

It is well settled by authority and on principle, that the party whose signature to a paper is obtained by fraud as to the character of the paper itself, who is ignorant of such character, and has no intention of signing it, and who is guilty of no negligence in affixing his signature, or in not ascertaining the character of the instrument, is no more bound by it than if it were a total forgery, the signature included. *Walker* v. *Ebert*, 29 Wis. 194; *Foster* v. *Mackinnon*, Law Rep. 4 C. P. 704; *Whitney* v. *Snyder*, 2 Lansing, 477; *Nance* v. *Lary*, 5 Ala. 370; *Putnam* v. *Sullivan*, 4 Mass. 45; *Taylor*

v. *Atchison,* 54 Ill. 196; *Wait* v. *Pomeroy,* 20 Mich. 425; *Caulkins* v. *Whisler,* 29 Iowa, 495.

In *Walker* v. *Ebert, supra,* the court after referring to several cases, and laying down in substance the above propositions of law, proceeded to say: "The reasoning of the above cases is entirely satisfactory and conclusive upon this point. The inquiry in such cases goes back of all questions of negotiability, or of the transfer of the supposed paper to a purchaser for value, before maturity and without notice. It challenges the origin or existence of the paper itself; and the proposition is, to show that it is not in law or in fact what it purports to be, namely, the promissory note of the supposed maker. For the purpose of setting on foot or pursuing this inquiry, it is immaterial that the supposed instrument is negotiable in form, or that it may have passed to the hands of a *bona fide* holder for value. Negotiability in such cases pre-supposes the existence of the instrument as having been made by the party whose name is subscribed; for, until it has been so made and has such actual legal existence, it is absurd to talk about a negotiation, or transfer, or *bona fide* holder of it, within the meaning of the law merchant. That which, in contemplation of law, never existed as a negotiable instrument, cannot be held to be such; and to say that it is, and has the qualities of negotiability, because it assumes the form of that kind of paper, and thus to shut out all inquiry into its existence, or whether it is really and truly what it purports to be, is *petitio principii,* begging the question altogether. It is, to use a homely phrase, putting the cart before the horse, and reversing the true order of reasoning, or rather preventing all correct reasoning and investigation, by assuming the truth of the conclusion, and so precluding any inquiry into the antecedent fact or premise, which is the first point to be inquired of and ascertained. For the purpose of this first inquiry, which must be always open when the objection is raised, it is immaterial what may be the nature of the supposed instrument, whether negotiable or not, or whether transferred or negotiated, or to whom or

in what manner, or for what consideration or value paid by the holder.    It must always be competent for the party proposed to be charged upon any written instrument, to show that it is not his instrument or obligation.    The principle is the same as where instruments are made by persons having no capacity to make binding contracts; as, by infants, married women, or insane persons; or where they are void for other cause, as, for usury; or where they are executed as by an agent, but without authority to bind the supposed principal. In these and all like cases, no additional validity is given to the instruments by putting them in the form of negotiable paper.    See *Veeder* v. *Town of Lima*, 19 Wis. 297 to 299, and authorities there cited.    See also *Thomas* v. *Watkins*, 16 Wis. 549."

. . We proceed to inquire whether, conceding that the appellant signed his name to the note with full knowledge of its character, it is invalid and void for the want of delivery.

The case of *Burson* v. *Huntington*, 21 Mich. 415, is in all of its facts, incidents, circumstances, and questions of law very similar to the case under consideration, and as the case is well considered, we make an extended quotation from the very able and learned opinion of the court.    The court say:

"These facts, if found by the jury, would show, not only that the note was never delivered to the payee, and that it therefore never had a legal existence as a note between the original parties, but that there was yet no completed or binding agreement of any kind, and was not to be until defendant should choose to get a surety on the note, and the payee should give him a deed of territory.    Until thus completed, the defendant had a right to retract.

"As a general rule, a negotiable promissory note, like any other written contract, has no legal inception or valid existence, as such, until it has been delivered in accordance with the purpose and intent of the parties.    See Edwards B. & N. 175, and authorities cited, and 1 Pars. B. & N. 48, 49, and cases cited; and see *Thomas* v. *Watkins*, 16 Wis.

Cline *v.* Guthrie.

549; *Mahon's Adm'r* v. *Sawyer,* 18 Ind. 73; *Carter* v. *Mc-Clintock,* 29 Mo. 464.

"Delivery is an essential part of the making or execution of the note, and it takes effect only from delivery (for most purposes); and if this be subsequent to the date, it takes effect from the delivery and not from the date. 1 Pars. *ubi supra.* This is certainly true as between the original parties.

"But negotiable paper differs from ordinary written contracts in this respect: that even a wrongful holder, between whom and the maker or endorser the note or endorsement would not be valid, may yet transfer to an innocent party, who takes it in good faith, without notice and for value, a good title as against the maker or indorser. And the question in the present case is, how far this principle will dispense with delivery by the maker. When a note payable to bearer, which has once become operative by delivery, has been lost or stolen from the owner, and has subsequently come to the hands of a *bona fide* holder for value, the latter may recover against the maker, and all indorsers on the paper, when in the hands of the loser; and the loser must sustain the loss. In such a case there was a complete legal instrument; the maker is clearly liable to pay it to some one; and the question is only to whom.

"But in the case before us, where the note had never been delivered, and therefore had no legal inception or existence as a note, the question is whether he is liable to pay at all, even to an innocent holder for value.

"The wrongful act of a thief or a trespasser may deprive the holder of his property in a note, which has once become a note, or property, by delivery, and may transfer the title to an innocent purchaser for value. But a note in the hands of the maker before delivery is not property, nor the subject of ownership, as such; it is, in law, but a blank piece of paper. Can the theft or wrongful seizure of this paper create a valid contract on the part of the maker against his will, where none existed before? There is no principle of the law of contracts upon which this can be done, unless the facts of the

case are such that, in justice and fairness, as between the maker and the innocent holder, the maker ought to be estopped to deny the making and delivery of the note. But it is urged that this case falls within the general principle which has become a maxim of law, that when one of two innocent persons must suffer by the acts of a third, he who has enabled such third person to occasion the loss, must sustain it. This is a principle of manifest justice, when confined within its proper limits. But the principle, as a rule, has many exceptions; and the point of difficulty in its application consists in determining what acts or conduct of the party sought to be charged can properly be said to have 'enabled the third person to occasion the loss,' within the meaning of the rule. If I leave my horse in the stable, or in the pasture, I cannot properly be said to have enabled the thief to steal him, within the meaning of this rule, because he found it possible to steal him from that particular locality. And upon examination, it will be found that this rule or maxim is mainly confined to cases where the party who is made to suffer the loss has reposed a confidence in the third person whose acts have occasioned the loss, or in some other intermediate person whose acts or negligence have enabled such third person to occasion the loss; and that the party has been held responsible for the acts of those in whom he had trusted, upon grounds analagous to those which govern the relation of principal and agent; that the party thus reposing confidence in another with respect to transactions by which the rights of others may be affected, has, as to the person to be thus affected, constituted the third person his agent in some sense, and having held him out as such, or trusted him with papers or *indicia* of ownership which have enabled him to appear to others as principal, as owner, or as possessed of certain powers, the person reposing this confidence is, as to those who have been deceived into parting with property or incurring obligations on the faith of such appearances, to be held to the same extent as if the fact had accorded with such appearances.

Cline *v.* Guthrie.

"Hence, to confine ourselves to the question of delivery, the authorities in reference to lost or stolen notes which have become operative by delivery, have no bearing upon the question. If the maker or indorser, before delivery to the payee, leave the note in the hands of a third person as an escrow, to be delivered upon certain conditions only, or voluntarily deliver it to the payee, or (if payable to bearer) to any other person for a special purpose only, as to be taken to, or discounted by a particular bank, or to be carried to any particular place or person, or to be used only in a certain way, or upon certain conditions not apparent upon the face of the paper, and the person to whom it is thus entrusted violate the confidence reposed in him, and put the note into circulation ; this, though not a valid delivery as to the original parties must, as between a *bona fide* holder for value, and the maker or indorser, be treated as a delivery, rendering the note or indorsement valid in the hands of such *bona fide* holder; or if the note be sent by mail, and get into the wrong hands; as the party intended to deliver to some one, and selects his own mode of delivery, he must be responsible for the result. These principles are too well settled to call for the citation of authorities, and manifestly it will make no difference in this respect, if the note or indorsement were signed in blank, if the maker or indorser part with the possession, or authorize a clerk or agent to do so, and it is done. 1 Parsons B. & N. 109–114, and cases cited, especially *Putnam* v. *Sullivan*, 4 Mass. 45, which was decided expressly upon the ground of the confidence reposed in the third person, as to the filling up, and in the clerk's as to delivery. And when the maker or indorser has himself been deceived by the fraudulent acts or representations of the payee or others, and thereby induced to deliver or part with the note or indorsement, and the same is thus fraudulently obtained from him, he must, doubtless, as between him and an innocent holder for value, bear the consequences of his own credulity and want of caution. He has placed a confi-

dence in another, and by putting the papers into his hands, has enabled him to appear as the owner, and to deceive others. Cases of this kind are numerous; but they have no bearing on the wrongful taking from the maker, when he never voluntarily parted with the instrument. Much confusion, however, has arisen from the general language used in the books and sometimes by judges, in reference to cases where the maker has voluntarily parted with the possession, though induced to do so by fraud; when it is laid down as a general rule, that it is no defence for a maker, as against a *bona fide* holder, to show that the note was wrongfully or fraudulently obtained, without attempting to distinguish between cases where the maker has actually and voluntarily parted with the possession of the note, and those where he has not.

" We do not assert that the general rule we are discussing— that 'where one of two innocent parties must suffer,' etc., must be confined exclusively to the cases where a confidence has been placed in some other person (in reference to delivery) and abused.

" There may be cases where the culpable negligence or recklessness of the maker in allowing an undelivered note to get into circulation might justly estop him from setting up non-delivery; as if he were knowingly to throw it into the street, or otherwise leave it accessible to the public, with no person present to guard against its abduction under circumstances when he might reasonably apprehend that it would be likely to be taken."

It is quite clear to us that the court erred in sustaining the demurrer to the third paragraph of the answer and in overruling the motion for a new trial.

The judgment is reversed, with costs; and the cause is remanded, with directions to the court below to grant a new trial and then overrule the demurrer to the third paragraph of the answer, and for further proceedings in accordance with this opinion.

*S. K. Wolfe,* for appellant.

*J. Y. Allison,* and *W. T. Friedley,* for appellee.